## SILICA PRODUCTS CO. v. HAYDITE CO. et al.

District Court, E. D. Illinois.

Sept. 27, 1929.

Delos G. Haynes, of St. Louis, Mo., R. E. Watson (of Watson, Gage & Ess), and

Thomas E. Scofield, both of Kansas City, Mo., for plaintiff.

H. G. Cook, of St. Louis, Mo., Henry M. Huxley, of Chicago, Ill., and Wendell H. Cloud, of Kansas City, Mo., for defendants.

WHAM, District Judge.

The bill of complaint charges an infringement by the defendants of claims 1 to 6 and 10 and 11 of United States patent No. 1,314,752, issued to Oscar Olsen on September 2, 1919, upon his application filed May 22, 1918. The complainant is the assignee of the Olsen patent. The Olsen patent is entitled "Burned Shale and Method of Preparing The Same and Concrete Made Therefrom." Two of the objects of the invention are set forth in the patent as follows:

"Another object of the invention is to provide a light, inert material highly resistant to stresses to take the place of the usual sand and crushed rock in concrete.

"Another object of the invention is to provide a concrete having a high elastic limit or co-efficient of elasticity, and a high ultimate compressive strength."

The specifications of the patent also contain the following:

"In the practice of my invention I take shale rock which has preferably been decomposed by the action of the elements and burn it in a kiln or otherwise subject it to a temperature of 2000 degrees Fahrenheit or above for a period determined by the nature of the rock so that all organic matter therein is destroyed and it is reduced to a light, porous, hard material. * * * I do not know the exact composition of the shale after it has been burned but have found that it is inert chemically in the presence of air, water, sea water and many other substances, and that it is a dead material, that is, there are no latent possibilities of chemical reaction within the substance.

"After burning the shale the resultant pieces are crushed and graded. The very fine material is a superior refining agent in the refining of sugar and oil and for this purpose displaces the commonly used Fuller's Earth. The larger pieces of the material I substitute for crushed rock in the preparation of concrete, the finer particles being substituted for sand in the mixture."

In connection with the statement in the patent of the method of making concrete and the uses for which concrete so made is adapted, the light weight, compressive strength, and elasticity of the concrete are among the qualities which are strongly emphasized. Other qualities mentioned are those of being a nonconductor of heat, sound, and electricity; also of heat resistance and being unaffected by the elements, or sea water.

The claims of the patent which are charged as being infringed by the defendants are as follows:

"1. A composition of matter comprising a mixture of coarse and fine pieces of shale rock which have been burned but not clinkered.

"2. The method of making concrete which consists in burning without clinkering shale rock, crushing the burnt material into fine and coarse pieces, and mixing a mixture of said fine and coarse pieces with a binding material.

"3. An article of manufacture comprising naturally decomposed shale rock which has been burned but not clinkered.

"4. The method of preparing shale rock for use as an aggregate which consists in burning the rock, crushing it, and treating the crushed and burned material to eliminate the pulverulent particles.

"5. Concrete comprising as an ingredient naturally decomposed shale rock which has been burned but not clinkered.

"6. A concrete comprising Portland cement and an aggregate consisting entirely of finely crushed burned shale rock and coarsely crushed burned shale rock."

"10. The method of making concrete which consists in burning shale rock, crushing the burnt material into fine and coarse pieces, and mixing a mixture of said fine and coarse pieces with a binding material and water.

"11. A concrete comprising a binding material and an aggregate consisting entirely of finely crushed burned shale rock and coarsely crushed burned shale rock."

As pointed out in the complainant's brief, the claims in suit may be divided into three general subdivisions: First, those covering the material itself; second, those drawn to the method of manufacture; and, third, those claiming the concrete made from the material which in the present case constitute building blocks made by the Western Brick Company.

The chief controversy in this suit has been with reference to the material and the method of manufacture. The complainant alleges that the material now being produced by the Haydite Company and Western Brick

Company at their respective plants in East St. Louis, Ill., and Danville, Ill., and the method used in the production of the same, constitute infringements of the Olsen patent. By agreement of counsel the material produced at the Western Brick Company plant at Danville and the method of production there used is taken as being identical with the material produced and methods used in the Haydite plant at East St. Louis and thereby the necessity for proof is confined to the Danville plant.

Both of the defendants are operating as assignees of the owner of patent No. 1,255,-878, issued February 12, 1918, to Stephen J. Hayde, and claim the protection of that patent. Defendants further claim that neither the material nor the method used by the defendants is disclosed or claimed in the Olsen patent; also, that the material and the process disclosed in the Olsen patent were old when patented by Olsen.

The questions in this case which are specifically presented for determination are as follows: Are the defendants' material and method of production infringements upon the Olsen patent? Second, if so, were such material and method new when claimed in the Olsen patent, or had they been anticipated by prior patents or by having been reduced to practice by Stephen J. Hayde or others?

Under the evidence in the case, hereinafter discussed, the first question must be answered in the negative. The answer to the second question must be that the material claimed by Olsen was old, but the method, burning without clinkering by subjecting the material to a temperature of 2,000 degrees Fahrenheit or above as indicated in the description of the practice of the invention, was new.

Taking up the second question first, the evidence establishes conclusively that Stephen J. Hayde had produced a light-weight aggregate from burning shale and clay before the date of Olsen's application for patent. Under the evidence the date of Olsen's conception and reduction to practice must be taken as May 22, 1918, the date of his application. The notation upon the May 29, 1918, test sheet of the Smith-Emory Laboratory which is stipulated to have been placed there by Olsen himself, to the effect that the light-weight sample covered by the test sheet had been in salt water for fourteen months, cannot be taken, without corroboration which is wholly lacking, particularly in view of Olsen's previous knowledge of Hay-

de's experiments, as establishing the fact that the sample had been manufactured as early as March 29, 1917. On the other hand, the evidence shows that Stephen J. Hayde in 1915 had a burned, light-weight, expanded material which he sent from California to his nephew George Hayde in Kansas City. The letter to his nephew concerning the material directs special attention to the light-weight characteristic of the burned material. The evidence further shows that from March to September, 1917, Hayde submitted samples of burned aggregate to the Kansas City Laboratory for testing. Four of the nineteen samples submitted were of such exceptional lightness that Dr. Cross, the chemist in charge of the laboratory, noted the fact on the test sheet, though he says Mr. Hayde did not seem particularly interested in the fact and had requested no tests for weight. Dr. Cross, who is now a stockholder in the complainant company, states, however, that there is no doubt but that Hayde "had a light-weight aggregate." The foregoing evidence, together with the tests made on Hayde's material by the United States Shipping Board, the material introduced in evidence which was sent to Prof. Duff A. Abrams for testing in the laboratory at Lewis Institute during April and May, 1917, and the mass of evidence which may be taken as highly corroborative, to the effect that Hayde had been experimenting constantly for several years prior to 1918 to perfect a method of producing a satisfactory light-weight aggregate, burned from clay and shale, often with excellent results, shows conclusively to my mind that Hayde had conceived and produced a light-weight aggregate such as Olsen claims in his patent before Olsen conceived or produced it.

As to the precise method used by Hayde when producing his light-weight aggregate, the evidence is not sufficiently clear to be conclusive. Certainly the method disclosed in his patent No. 1,255,878 is not the method claimed by Olsen in his patent.

The material which is being produced at the plant of the Western Brick Company at Danville is a light-weight, cellular material produced by expansively burning shale such as is used in the making of brick at the same plant.

An examination of the Olsen patent discloses that the material which is claimed to be protected by the patent is described as a "light, porous, hard material" produced by subjecting "shale rock which has preferably been decomposed by the action of the ele-

ments" to a "temperature of 2,000 degrees Fahrenheit or above for a period determined by the nature of the rock so that all organic matter therein is destroyed"; the resultant material being described in the claims as "burned but not clinkered." An examination of the file wrapper of the Olsen patent discloses that the descriptive term "burned but not clinkered" was inserted in the patent by amendment dated December 13, 1918. Prior to that time, to meet the objection of the examiner that the process claimed by the patent as originally drawn was anticipated by prior patents, the applicant, by amendment dated September 27, 1918, used the term "sintered" as a substitute for the word "burned" as describing the extent to which the shale was burned by his process in producing the material claimed, and in each claim where the word "burned" was originally used and the term "burned but not clinkered" is used in the patent as finally allowed, the word "sinter" or "sintered" or "sintering" was used. Claims 3, 5, 6, 10, and 11, in which the word "sinter" was used, were rejected by the examiner on October 30, 1918, without comment, upon Hayde patent, No. 1,255,878, issued February 12, 1918. The applicant again amended his patent by letter dated December 13, 1918, omitting the term "sinter" and substituting the term "burned but not clinkered" and pointed out to the examiner the distinction between material produced by that method and the material produced by the method claimed by Stephen J. Hayde in his patent No. 1,255,-878. It is apparent, therefore, that Oscar Olsen in substituting "burned but not clinkered" for the word "sintered" gave up the process of "sintering" the material in so far as that process is not comprised within the term "burned but not clinkered."

The evidence shows that the material produced by the Western Brick Company is obtained by charging shale which has been ground so that the largest pieces do not exceed one and one-half inches in size to an inclined rotary kiln approximately forty feet in length, subjecting the shale, as it progresses through the kiln, to temperatures ranging from approximately 600 degrees Fahrenheit at the charging end to approximately 2,000 to 2,075 degrees Fahrenheit through the last ten to twelve feet at the discharge end of the kiln. The object is to so apply the heat that it will first soften the material without evolving the gases produced by the heat from the organic matter contained in the raw shale. Continued application of heat then expands the gases and thereby expands the softened material leaving it in a cellular, bloated condition. The cellular, bloated condition gives the material its relative light weight as well as other useful qualities.

All of the heat is supplied from the discharge end of the kiln and is so arranged that the material, already softened exteriorly by the heat to which it has been subjected, suddenly passes into the area of highest temperature at about ten feet from the discharge end, which temperature is maintained upon the material to the point of discharge. As the material comes into the range of the highest temperature, it is in the same condition as when charged to the kiln, in that there is no coherence between the pieces of shale. Coming quickly into the high temperature with exterior already softened, the intense heat impinged upon the material, in effect, fuses the exterior of the pieces effectually trapping the gases within and insuring the greatest possible expansion as the material softens and the gas expands. The period which elapses from the time the material comes into the area of greatest heat until it is discharged from the kiln is ten to fifteen minutes. Upon coming into the area of highest temperature, the material softens rapidly, beginning to cohere or agglomerate and forms masses so that it is discharged in soft lumps ranging from small sizes to twelve to sixteen inches across.

The masses discharged from the kiln are termed "sinters" by the complainant's expert witness Lyons and "clinkers" by the defendants' witnesses Butterworth and Doughty. Using the dictionary meaning of the words "sinter" and "clinker," the material, as it comes from the kiln, is more accurately termed a "sinter," or rather the material has been produced by "sintering" the shale. Webster's New International Dictionary defines the verb "sinter" as follows: "To become or cause to become a coherent mass by heating without thoroughly melting." Some of the witnesses described the effect of the heat upon the material as producing first an incipient fusion and resultant incipient vitrification. While there seemed to be some difference among the expert witnesses as to the scientific meaning of the terms "incipient fusion" and "incipient vitrification," their application to the effect upon the shale of the process used by the defendants, giving the words their commonly accepted meaning, constitutes a practical if not accurate description.

"Incipient" is defined as, "Beginning to or be or show itself; commencing; initial." Can it be said that where fusion is commencing there is no fusion, or where vitrification is beginning to be or show itself there is no vitrification? It seems that the answer must be in the negative. It was fusion that sealed the exterior of the pieces of shale to prevent the escape of the gases and the initial stages of fusion of the whole mass that later caused the material to agglomerate and "sinter." "Sintered" shale is, therefore, partially fused and partially vitrified in the sense of incipient fusion and incipient vitrification and in the sense that the words "vitrified" and "clinkered" are discussed in the Olsen file wrapper, partially "clinkered." It would appear that the reason that Olsen gave up the word "sintering" and substituted "burned but not clinkered" was that "sintering" involves a degree of "clinkering," and it was his purpose to distinguish his patent definitely from the prior Hayde patent which used the descriptive word "clinkers." The contention of counsel for the complainant that Olsen used "burned but not clinkered" as synonymous with "sintering" cannot be held to be sound.

In the bulletin issued by the Western Brick Company to advertise its product "Haydite" introduced in evidence by the complainant appears the following descriptive sentence:

"The resultant product, Western Haydite, is a series of cells, the partitions of which are thoroughly vitrified, fused shale, impervious and of great structural strength."

This statement shows the understanding of the defendant Western Brick Company as to the structure of the material produced by it.

It would seem from the evidence that there is no escape from the conclusion that the heat to which the shale is subjected in the defendant's plant does produce a certain degree of melting and fusing and to the same degree a state of vitrification and clinkering in the finished product. The material has been "sintered"; that is, heated to a point that has produced a coherent mass.

The process of burning shale disclosed in the Olsen patent stops short of "sintering" the shale, and since the process used by the defendants "sinters" the shale it does not infringe the Olsen patent. For the same reason the material produced by the defendants by "sintering" the shale, and the concrete made from such material, do not infringe the Olsen patent.

Another distinguishing feature of the method used by the defendants is the process of preparation that the material is subjected to as it passes approximately thirty feet from the charging end of the kiln through increasing temperatures to the point where it enters suddenly the area of highest temperature maintained through the last ten feet of the kiln to the end of discharge. From the evidence it appears that this process of preparation is of the utmost importance in producing the material being manufactured by the defendants. The Olsen patent discloses no such process of preparation, but indicates that in practicing the teachings of the patent the shale would be subjected, without preparation, to a temperature of 2,000 degrees Fahrenheit or above.

The complainant's bill will be dismissed for want of equity.